DAVIS POLK & WARDWELL LLP
450 Lexington Ave
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Timothy Graulich, Esq.
Angela M. Libby, Esq.
Dylan A. Consla, Esq.

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
| | |
|---|---|
| **In re** : | **Chapter 15** |
| : | |
| **BALLANTYNE RE PLC,** : | **Case No. 19-_____ (___)** |
| : | |
| **Debtor in a foreign proceeding.** : | |
| : | |

------------------------------------------------------------- x

<u>**MOTION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**(III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME,**
**AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**</u>

# TABLE OF CONTENTS

PAGE

RELIEF REQUESTED ........................................................................................................1

JURISDICTION .................................................................................................................3

BACKGROUND ................................................................................................................3

A.    Debtor's Business Operations and Preexisting Capital Structure ..................3

B.    The Events Preceding Commencement of the Irish Proceeding ....................6

C.    Description of Scheme and Restructuring .....................................................9

D.    Commencement of Irish Proceeding and Restructuring Process .................12

BASIS FOR RELIEF REQUESTED .................................................................................15

A.    The Debtor Is Eligible for Chapter 15 Relief .............................................16

    1.    The Debtor Meets General Eligibility Requirements of Section 109(a)
         of the Bankruptcy Code .........................................................................16

    2.    The Debtor Meets Specific Eligibility Requirements of Section 1517(a)
         of the Bankruptcy Code .........................................................................19

        (a)    The Irish Proceeding Is a Foreign Proceeding Within the
             Meaning of Section 1502 of the Bankruptcy Code ..........................19

            (i)    The Foreign Proceeding Is a Proceeding ....................................20

            (ii)    The Foreign Proceeding Is Judicial or Administrative in
                 Character ...................................................................................21

            (iii)    The Foreign Proceeding Is Collective in Nature..........................22

            (iv)    The Foreign Proceeding Is Located in a Foreign Country..........23

            (v)    The Foreign Proceeding Is Authorized or Conducted
                 Under a Law Related to Insolvency or the Adjustment of
                 Debts .......................................................................................23

            (vi)    Under the Foreign Proceeding, the Debtor's Assets and
                 Affairs Are Subject to the Control or Supervision of a
                 Foreign Court ...........................................................................24

            (vii)    The Foreign Proceeding Is for the Purpose of
                 Reorganization or Liquidation of the Debtor..............................25

        (b)    The Foreign Proceeding Is a "Foreign Main Proceeding"..................25

        (c)    The Chapter 15 Case Has Been Commenced by a Duly
              Authorized Foreign Representative .....................................................27

i

3.      The Petition for Recognition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) ...............................28

B.     Enforcement of Sanction Order and Scheme, Including Releases Therein, and Related Discretionary Relief Pursuant to Sections 1521, Including Entrustment for Distribution to Effectuate the Scheme, Is Proper ............................30

1.      Just Treatment of All Holders of Claims Against or Interests in the Debtor's Property.............................................................................................32

2.      Protection of Claim Holders in the United States Against Prejudice and Inconvenience in the Processing of Claims in the Foreign Proceeding...........33

3.      Distribution of Proceeds Substantially in Accordance with the Bankruptcy Code ..........................................................................................34

4.      The General Balancing Test Weighs in Favor of Granting Relief..................34

C.     Enforcement of the Scheme and Releases Is Also Proper Under Section 1507 ..........36

D.     Enforcement of Foreign Plans and Releases Is Consistent with Principles of Comity.............................................................................................................................38

E.     The Standard for Injunctive Relief Is Satisfied with Respect to Enforcement of the Scheme and Releases ..............................................................................................44

F.     The Relief Requested Is Consistent with United States Public Policy and Policy Behind Bankruptcy Code...................................................................................46

NOTICE....................................................................................................................................49

NO PRIOR REQUEST ...........................................................................................................49

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*In re ABC Learning Centres Ltd.*,
   445 B.R. 318 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013) ............................. 22

*In re AJW Offshore, Ltd.*,
   488 B.R. 551 (Bankr. E.D.N.Y. 2013) ................................................................ 32

*In re Artimm, S.r.L.*,
   335 B.R. 149 (Bankr. C.D. Cal. 2005) ................................................................ 32

*In re Atlas Shipping A/S*,
   404 B.R. 726 (Bankr. S.D.N.Y. 2009) .......................................................... *passim*

*In re Avanti Commc'ns*,
   582 B.R. 603 (Bankr. S.D.N.Y. 2018) .......................................................... *passim*

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
   238 B.R. 25 (Bankr. S.D.N.Y. 1999) ................................................................ 21

*In re Bd. of Dirs. of Multicanal S.A.*,
   307 B.R. 384 (Bankr. S.D.N.Y. 2004) ............................................................... 39

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
   No. 05-17811 (BRL), 2006 WL 686867 (Bankr. S.D.N.Y. Feb. 24, 2006) .......................... 37

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
   528 F.3d 162 (2d Cir. 2008) ................................................................ 32, 39, 46

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
   374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ......26, 29, 36, 37

*In re Berau Cap. Res. Pte Ltd.*,
   540 B.R. 80 (Bankr. S.D.N.Y. 2015) ............................................................ 17, 19

*In re Betcorp Ltd.*,
   400 B.R. 266 (Bankr. D. Nev. 2009) ................................................................ 21

*Canada S. Ry. Co. v. Gebhard*,
   109 U.S. 527 (1883) ................................................................................ 39

*In re Cell C Proprietary Ltd.*,
   571 B.R. 542 (Bankr. S.D.N.Y. 2017) ............................................................... 38

i

*In re Cenargo Int'l PLC*,
    294 B.R. 571 (Bankr. S.D.N.Y. 2003) ................................................................. 18

*Clarkson v. Coughlin*,
    898 F. Supp. 1019 (S.D.N.Y. 1995) .................................................................... 44

*CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*,
    482 B.R. 96 (Bankr. S.D.N.Y. 2012) ................................................................. 32

*In re Culmer*,
    25 B.R. 621 (Bankr. S.D.N.Y. 1992) ............................................................. 33, 37

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
    737 F.3d 238 (2d Cir. 2013) ................................................................................17

*In re ENNIA Caribe Holding N.V.*,
    594 B.R. 631 (Bankr. S.D.N.Y. 2018) ........................................................... 22, 24

*In re ENNIA Caribe Holding N.V.*,
    No. 18-12908 (MG), 2019 WL 365749 (Bankr. S.D.N.Y. Jan. 29, 2019) ............ 32

*In re Fairfield Sentry Ltd.*,
    714 F.3d 127 (2d Cir. 2013) ..........................................................................25, 26

*In re Garcia Avila*,
    296 B.R. 95 (Bankr. S.D.N.Y. 2003) ................................................................. 44

*In re Glob. Ocean Carriers*,
    251 B.R. 31 (Bankr. D. Del. 2000) ................................................................... 18

*In re Grant Forest Prods., Inc.*,
    440 B.R. 616 (Bankr. D. Del. 2010) ................................................................. 35

*Hilton v. Guyot*,
    159 U.S. 113 (1895) .......................................................................................... 40

*In re Ionica*,
    241 B.R. 829 (Bankr. S.D.N.Y. 1999) ............................................................... 34

*In re Ionosphere Clubs, Inc.*,
    922 F.2d 984 (2d Cir. 1990) ...............................................................................47

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005) .............................................................................. 47

*In re Lines*,
    81 B.R. 267 (Bankr. S.D.N.Y. 1988) ..................................................................44

*In re Metcalfe & Mansfield Alt. Inv.*,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010) ........................................................ *passim*

ii

*In re MMG LLC,*
   256 B.R. 544 (Bankr. S.D.N.Y. 2000) ................................................................. 44

*In re Ocean Rig UDW Inc.,*
   570 B.R. 687 (Bankr. S.D.N.Y. 2017) ................................................... 17, 26, 42

*In re Octaviar Admin. Pty Ltd.,*
   511 B.R. 361 (Bankr. S.D.N.Y. 2014) ............................................................ 17, 18

*Oui Fin. LLC v. Dellar,*
   No. 12 CIV. 7744 (RA), 2013 WL 5568732 (S.D.N.Y. Oct. 9, 2013) .................................. 41

*In re Hourani,*
   180 B.R. 58 (Bankr. S.D.N.Y. 1995) ................................................................. 33

*In re Qimonda AG Bankr. Litig.*
   433 B.R. 547–58 (E.D. Va. 2010) ....................................................................... 32

*In re Rede Energia S.A.,*
   515 B.R. 69 (Bankr. S.D.N.Y. 2014) ............................................................ 38, 45

*In re Rubin,*
   160 B.R. 269 (Bankr. S.D.N.Y. 1993) ............................................................... 44

*In re Sino-Forest Corp.,*
   501 B.R. 655–64 (Bankr. S.D.N.Y. 2013) .................................................. *passim*

*SNP Boat Serv. S.A. v. Hotel Le St. James,*
   483 B.R. 776 (S.D. Fla. 2012) ......................................................................... 32

*In re SphinX, Ltd.,*
   351 B.R. 103 (Bankr. S.D.N.Y 2006), *aff'd*, 371 B.R. 10 (Bankr. S.D.N.Y 2007) ..........26, 28

*In re Suntech Power Holdings Co.,*
   520 B.R. 399 (Bankr. S.D.N.Y. 2014) .......................................................... 17, 26

*In re Treco,*
   240 F.3d 148 (2d Cir. 2001) ........................................................................... 33

*In re U.S. Steel Canada Inc.,*
   571 B.R. 600 (Bankr. S.D.N.Y. 2017) .............................................................. 38

*Victrix v. Salen Dry Cargo A.B.,*
   825 F.2d 709 (2d Cir. 1987) ................................................................ 38, 39, 44, 47

*In re Vitro, S.A.B. de C.V.,*
   470 B.R. 408 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de C.V.*,
   701 F.3d 1031 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) .......................... 27, 47

*In re Yukos Oil Co.,*
   321 B.R. 396 (Bankr. S.D. Tex. 2005) .............................................................. 18

<u>Statutes & Rules</u>

11 U.S.C. § 101(23) ......................................................................................................... 20

11 U.S.C. § 101(24) .............................................................................................. 2, 27, 28

11 U.S.C. § 103(a) ........................................................................................................... 16

11 U.S.C. § 105(a) .............................................................................................................2

11 U.S.C. § 109(a) ...................................................................................................... *passim*

11 U.S.C. § 304 .......................................................................................................... 39, 45

11 U.S.C. § 304(c)(4) ...................................................................................................... 34

11 U.S.C. § 522 .......................................................................................................... 30, 31

11 U.S.C. § 544 .......................................................................................................... 30, 31

11 U.S.C. § 545 .......................................................................................................... 30, 31

11 U.S.C. § 547 .......................................................................................................... 30, 31

11 U.S.C. § 548 .......................................................................................................... 30, 31

11 U.S.C. § 550 .......................................................................................................... 31, 32

11 U.S.C. § 724(a) ..................................................................................................... 30, 31

11 U.S.C. § 1501 ........................................................................................... 3, 15, 35, 46

11 U.S.C. § 1501(a) ........................................................................................................ 49

11 U.S.C. § 1502 ............................................................................................................. 19

11 U.S.C. § 1502(4) ........................................................................................................ 25

11 U.S.C. § 1504.................................................................................................2, 3, 28, 30

11 U.S.C. § 1506.............................................................................................................47

11 U.S.C. § 1507 ...................................................................................................... *passim*

11 U.S.C. § 1507(a) ........................................................................................................ 36

11 U.S.C. § 1507(b) ............................................................................................ 36, 37, 38

11 U.S.C. § 1509.................................................................................................................3

11 U.S.C. § 1509(a) .........................................................................................................30

11 U.S.C. § 1510 ...................................................................................................................2

11 U.S.C. § 1515 .......................................................................................................... *passim*

11 U.S.C. § 1515(a) .............................................................................................................28

11 U.S.C. § 1515(b) .............................................................................................................28

11 U.S.C. § 1516(a) .............................................................................................................28

11 U.S.C. § 1516(b) .............................................................................................................29

11 U.S.C. § 1516(c) ............................................................................................................ 26

11 U.S.C. § 1517 ...................................................................................................................2

11 U.S.C. § 1517(a) ...................................................................................................... *passim*

11 U.S.C. § 1519 ................................................................................................................ 29

11 U.S.C. § 1519(a) ............................................................................................................ 31

11 U.S.C. § 1520 ............................................................................................................2, 30

11 U.S.C. § 1520(a) .............................................................................................................31

11 U.S.C. § 1521 ..............................................................................................2, 31, 38, 41

11 U.S.C. § 1521(a) ...................................................................................................... 30, 31

11 U.S.C. § 1521(a)(5) ...................................................................................................... 30

11 U.S.C. § 1521(a)(7) ...................................................................................................... 30

11 U.S.C. § 1521(b) .......................................................................................................... 30

11 U.S.C. § 1521(e) ........................................................................................................... 44

11 U.S.C. § 1522 ...................................................................................................................2

11 U.S.C. § 1522(a) ...................................................................................................... 31, 32

28 U.S.C. § 157 .................................................................................................................... 3

28 U.S.C. § 157(b)(2)(P) ..................................................................................................... 3

28 U.S.C. § 1334 .................................................................................................................. 3

28 U.S.C. § 1410 .................................................................................................................. 3

Fed. R. Bankr. P. 1007(a)(4)..................................................................................2, 16, 28, 29

Fed. R. Bankr. P. 2002(q) ..................................................................................................49

Fed. R. Bankr. P. 7007.1 ...........................................................................................2, 29

Local R. 1007-3 .........................................................................................................2, 29

OTHER AUTHORITIES

8 Richard Levin & Henry J. Sommer *Collier on Bankruptcy* (16th ed.*)*......................................24

*Amended Standing Order of Reference* dated January 31, 2012, Reference M-431,
*In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)
(Preska, C.J.)..................................................................................................................3

David  L. Lawton & Shannon B. Wolf,  *The Thing about  Schemes in the Scheme of Things:
Recognition of Schemes of Arrangement under Chapter 15 of the U.S. Bankruptcy Code,*
(INSOL International Technical Series Issue No. 38, March 2018).............................................20

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Adrian Masterson, in his capacity as the duly appointed foreign representative (the "**Foreign Representative**") of the reorganization proceedings consisting of (i) the proceeding entitled *In the Matter of Ballantyne Re Plc and In the Matter of the Companies Acts 2014 and In the Matter of a Proposal for a Scheme of Arrangement pursuant to Part 9, Chapter 1 of the Companies Act 2014* bearing the High Court of Ireland (the "**Irish Court**") record number 145 Cos 2019 (the "**Scheme Convening Proceeding**") currently pending before the Irish Court of the above-captioned debtor (the "**Debtor**," the "**Company**" or "**Ballantyne**"), a public limited company incorporated under the laws of Ireland, concerning a scheme of arrangement (the "**Scheme**") and (ii) the sanction proceeding to be commenced with respect thereto also entitled *In the Matter of Ballantyne Re Plc and In the Matter of the Companies Acts 2014 and In the Matter of a Proposal for a Scheme of Arrangement pursuant to Part 9, Chapter 1 of the Companies Act 2014* (the "**Scheme Sanction Proceeding**" and together with the Scheme Convening Proceeding, the "**Irish Proceeding**"), has commenced this chapter 15 case ancillary to the Irish Proceeding and respectfully submits this motion (this "**Motion**") and represents as follows:

## **RELIEF REQUESTED**

1.      Pursuant to this Motion, the Foreign Representative respectfully requests, pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, 1521 and 1522 of title 11 of the United States Code (the "**Bankruptcy Code**"), entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**") (i) recognizing the Irish Proceeding as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code; (ii) recognizing the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the Irish Proceeding; (iii) recognizing, granting comity to, and

giving full force and effect in the United States to the Irish Proceeding, the Scheme and the Irish Orders (as defined herein); (iv) entrusting to the Foreign Representative the administration, realization and distribution of all assets of the Debtor within the territorial jurisdiction of the United States; (v) enjoining parties from taking any action inconsistent with the Scheme in the United States, including giving effect to the releases (as described herein, the "**Releases**"); (vi) authorizing and directing The Depository Trust Company ("**DTC**") and The Bank of New York Mellon (the "**Trustee**"), in its capacities as Trustee under the Indenture (as defined herein) and Trustee under the A&R Reinsurance Trust Agreement (as defined herein), and any successor trustee to take any and all actions necessary to give effect to the terms of the proposed restructuring of Ballantyne (the "**Restructuring**") and (vii) granting such other relief as the Court deems just and proper.  The relief requested in this Motion is without prejudice to any additional relief the Foreign Representative may request.

2.      In support of this Motion, the Foreign Representative refers the Court to the statements contained in: *Declaration of Adrian Masterson in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Plan, and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (the "**Masterson Declaration**"), *Declaration of Ruairi Rynn in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Plan, and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (the "**Rynn Declaration**"), and the *Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(a)(4) and 7007.1 and Local Rule 1007-3* (collectively, the "**Supporting Documents**"), which have been filed contemporaneously herewith and are incorporated herein by reference.

## JURISDICTION

3.      The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code, as well as the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.      Venue is proper under 28 U.S.C. § 1410 as the Debtor has assets within the United States located in New York, as described further herein.

5.      The Foreign Representative has properly commenced this chapter 15 case under sections 1504 and 1509 of the Bankruptcy Code by the filing of a petition for recognition of the Irish Proceeding under section 1515 of the Bankruptcy Code.

## BACKGROUND

A.      **Debtor's Business Operations and Preexisting Capital Structure**

6.      Ballantyne is a public limited company incorporated under the laws of Ireland, and operates as a special purpose vehicle for the limited purpose of performing under that certain Indemnity Reinsurance Agreement, dated May 2, 2006, between Ballantyne and Security Life of Denver Insurance Company ("**SLD**") (as amended and restated on November 19, 2008, the "**Existing Indemnity Reinsurance Agreement**").  Pursuant to this agreement, the Debtor takes on indemnity reinsurance basis risks relating to the "**Defined Block of Business**," which consists of specified term life insurance policies and treaties that were issued between January 1, 1996 and April 30, 2005.  The Defined Block of Business was originally ceded to Ballantyne for reinsurance purposes from Scottish Re (U.S.), Inc. ("**SRUS**") in 2006.

7.      As a special purpose vehicle, Ballantyne does not engage in any other business, enter into any other insurance or reinsurance arrangements, or provide reserve credit to any entity other than SLD.  Administration of its reinsurance obligations is currently performed by Hannover Life Reassurance Company of America ("**Hannover**") in its capacity as third–party administrator to SLD.

8.      To fund its obligations under the Existing Indemnity Reinsurance Agreement, Ballantyne issued notes pursuant to a New York law–governed Indenture (as amended or supplemented from time to time, the "**Indenture**"), dated May 2, 2006, among Ballantyne, the Trustee, Ambac Assurance UK Limited ("**Ambac**") and Assured Guaranty (Europe) plc ("**AGE**").  Pursuant to the Indenture, multiple series of Class A Notes (the "**Class A Notes**") were issued to various purchasers (collectively, the "**Class A Noteholders**"), in an aggregate amount of $1.65 billion.  Series of Class B Notes, Class C Notes and Class D Notes (collectively with the Class A Notes, the "**Notes**," and the holders thereof, collectively with the Class A Noteholders, the "**Noteholders**") were also issued to various purchasers, in an aggregate amount of $270.5 million.

9.      Under the Indenture, Ambac serves as the "**Directing Party**," as that term is defined in the Indenture, and maintains certain rights of control thereunder including the right to provide certain consents on behalf of all holders of Notes.  In addition, Ambac has also provided financial guarantees for certain of the Class A Notes (the "**Ambac Financial Guarantees**"), whereby payment of scheduled interest payments and the ultimate repayment of principal on such Class A Notes at final legal maturity is guaranteed by Ambac.  AGE and its United States affiliate Assured Guaranty Corp. (together with AGE, "**Assured Guaranty**," and collectively with Ambac, the "**Financial Guarantors**") have provided similar financial

guarantees for certain other Class A Notes (the "**Assured Guaranty Financial Guarantees**," and with the Ambac Financial Guarantees, the "**Financial Guarantees**").

10.     At inception, the Company established a trust account (the "**Reinsurance Trust Account**") pursuant to the Existing Indemnity Reinsurance Agreement and that certain Trust Agreement, dated May 2, 2006, between Ballantyne, SLD and the Trustee (as amended and restated on November 19, 2008, the "**A&R Reinsurance Trust Agreement**").  The assets in the Reinsurance Trust Account are held to satisfy the Debtor's obligations under the Existing Indemnity Reinsurance Agreement, in particular the requirement to hold collateral with a market value equivalent to at least 102% of the statutory reserve requirement.  The assets in the Reinsurance Trust Account are pledged to SLD, with the residual interest in the Reinsurance Trust Account pledged to the Trustee for the benefit of the Noteholders.  At its inception, the Reinsurance Trust Account comprised an account maintained for the purpose of holding Economic Reserves (as defined in the Existing Indemnity Reinsurance Agreement) and an account (the "**Excess Reserve Account**") maintained for the purpose of holding Excess Reserves (as defined in the Existing Indemnity Reinsurance Agreement).  The Company also established an operating account (the "**Surplus Account**") and an account (the "**Prefunded Account**") to hold funds for the purpose of making future contributions to the Reinsurance Trust Account if required to satisfy collateralization requirements.  The Debtor engaged J.P. Morgan Investment Management, Inc. ("**JPMIM**") as investment manager for the funds in such accounts.  The Excess Reserve Account and Surplus Account were originally funded with an aggregate of approximately $1.65 billion from the proceeds of the issuance of the Class A Notes, together with funding provided by SRUS in connection with ceding the Defined Block of Business to Ballantyne.

**B.      The Events Preceding Commencement of the Scheme Convening Proceeding**

11.      During the global financial crisis of 2007 to 2009, the investments held in the Excess Reserve Account and Surplus Account, which consisted primarily of subprime and Alt-A securities, suffered severe losses, totaling approximately $1 billion.  In addition to such investment losses, the Company's projected liabilities associated with the Defined Block of Business on a *pro rata* basis have been subject to upward revision since the commencement of the Existing Indemnity Reinsurance Agreement.  In 2008 and 2009, a series of contractual recaptures by SRUS and SLD under the Existing Indemnity Reinsurance Agreement reduced the Debtor's quota share in the Defined Block of Business to 33.5%.  At that time, SLD entered into a reinsurance agreement with Hannover.  SRUS sold ING U.S.'s individual life reinsurance business, which it has previously acquired, to Hannover in 2009 (thereby passing the administration of the Defined Block of Business to Hannover).

12.      In 2009, Ambac, in the name and on behalf of Ballantyne, commenced litigation against JPMIM relating to its management of the Company's investment accounts.  In early 2017, a settlement of such litigation was finalized pursuant to which the Company received $325.6 million in cash on April 17, 2017, in return for releases of all claims by the Company and Ambac against JPMIM.  The full amount of cash received was deposited into the Excess Reserve Account.

13.      The Company continues to suffer from a significant deficit of available assets compared to the amounts due to Noteholders and other creditors.  For example, as set forth in the Company's most recent audited financial statements, on December 31, 2017, the Company reported total assets of $1,254.8 million and total liabilities of $2,408.3 million, resulting in a deficit of $1,153.4 million.  Total liabilities included insurance contract liabilities of $384.6 million, which rank senior in priority to obligations with respect to the Notes.  In addition,

unaudited financial statements show that, as of December 31, 2018, the Company had total assets of \$1,219.4 million and total liabilities of \$2,447.5 million, resulting in a deficit of \$1,228.1 million.

14.     As a result of the depletion of funds in the Surplus Account, there were insufficient funds available to the Company to make interest payments.  Whenever such payment defaults occurred, the Financial Guarantors made payments to satisfy the Company's obligations under the Class A Notes guaranteed by the applicable Financial Guarantor.  The payment defaults and resulting payment by the Financial Guarantors triggered events of default under the Indenture, that are currently outstanding.

15.     In light of the impairment to the Notes, the Company understands that Ambac, in its capacity as Directing Party and Financial Guarantor, has been engaged with certain of the Class A Noteholders since August 2016 for the purpose of assessing the options to restructure the Company and/or the Company's liabilities under the Class A Notes and/or the Company's reinsurance obligations.  In 2017, FTI Consulting Financial Services Limited ("**FTI Consulting**"), in its capacity as financial adviser to Ambac, commenced a marketing process for the Defined Block of Business.  A list of potential counterparties was identified by FTI Consulting based on, amongst other factors, their existing experience and exposure to this segment of the reinsurance market, their transaction history, and their credit rating.  The list of potential counterparties was then reviewed with SLD to confirm that each of these parties was considered an acceptable replacement reinsurance counterparty.  FTI Consulting ran a multi-staged transaction process over an eleven-month period to August 2018.  As a result of this process, Swiss Re Life & Health America Inc. (the "**New Reinsurer**"), a leading provider of life and health reinsurance, was chosen as the preferred counterparty for several reasons, including

the value of assets required by the New Reinsurer to be transferred in connection with the Novation (as defined herein), and an assessment of execution risk.

16.     During the course of 2018, the Company was informed by Ambac that Ambac, Assured Guaranty, and other Noteholders representing approximately 79% of all Class A Notes, and SLD were supportive in principle of the proposed Restructuring.  The Company instructed William Fry as its Irish legal adviser, Davis Polk & Wardwell LLP ("**Davis Polk**") as its New York legal adviser and PwC Ireland as its financial adviser to assist it with reviewing the proposed Restructuring.

17.     The result of these formal negotiations led to the formulation of the Restructuring and the agreement of the most significant economic stakeholders to support the Restructuring through execution of the Lock-Up Support Agreement, dated April 12, 2019, between and among Ballantyne, Ambac, Assured Guaranty, SLD, the New Reinsurer and certain consenting Class A Noteholders party thereto (the "**Lock-Up Support Agreement**").  The Lock-Up Support Agreement binds the parties that must agree to the essential components of the Restructuring and ensures that all such parties are obligated to support the Restructuring in good faith and to not otherwise proceed in a manner adverse to the Restructuring or the Scheme.  In addition, the Lock-Up Support Agreement provides that the Company will, on implementation of the Restructuring, pay each consenting Class A Noteholder a fee of 1.25% of the par, principal value of the Class A Notes (the "**Lock-Up Fee**") held by such consenting Class A Noteholders who have (i) executed the Lock-Up Support Agreement, whether directly or through a joinder before the Lock-Up Deadline (5:00 p.m. ET on May 16, 2019) and (ii) complied in full with their obligations under the "Election Procedures" provided for in the Lock-Up Support Agreement.

**C.      Description of Scheme and Restructuring**

18.      The proposed Restructuring involves (i) the novation (the "**Novation**") of the Existing Indemnity Reinsurance Agreement currently between the Company and SLD to the New Reinsurer; (ii) the disbursement of assets from the Reinsurance Trust Account and Surplus Account to effectuate the Novation and payments to Class A Noteholders in satisfaction of their claims on implementation of the Restructuring of approximately $0.524 (including the Lock-Up Fee) per $1.00 in principal amount of Class A Notes (excluding the potential value that may be recovered from the Holding Period Trust (as defined in the Scheme Circular (as defined herein))) as a result of the application of funds in accordance with Section 6.05 of the Indenture (as effectuated by the Scheme and the Restructuring Agreement); (iii) the creation of the Holding Period Trust to, among other things, facilitate the distribution of deferred consideration to Class A Noteholders, provide a mechanism to preserve the Assured Financial Guarantees and take an assignment of certain causes of action for the potential benefit of the Class A Noteholders; (iv) the commutation of the Ambac Guarantees, pursuant to which holders of Class A Notes guaranteed by Ambac will receive, from Ambac, an additional payment of $0.174 (with respect to Class A-2a Notes) or $0.145 (with respect to Class A-3 Notes) per $1.00 in principal amount of Class A Notes; (v) the release of any claims of each Scheme Creditor (as defined herein) against the Released Parties[1] (which includes, among others, the Company, the Trustee and Ambac); (vi) the release of any claims of each holder of Class A Notes that are guaranteed by Ambac against Ambac (in its capacity as Financial Guarantor); and (vii) the release of any claims of any of the Financial Guarantors against the Company.

---

[1] The "**Released Parties**" consist of the Scheme Company (i.e., the Debtor), Ambac, Assured Guaranty, the Trustee, the Book-Entry Depository, the Auction Agent (as defined in the Indenture), the Securities Intermediary (as defined in the Indenture), the Reinsurance Trust Trustee, Merced, SLD, Voya and the New Reinsurer, and the legal and financial advisers to each of the foregoing parties, and the Scheme Company Directors (each as defined in the Scheme Circular).

19.    The Scheme, once sanctioned, will grant authority to the Company (on its own behalf and on behalf of all of the Scheme Creditors (as defined herein)) and the Trustee to execute the Restructuring Agreement (as defined below) and all related documents to be executed further to the Restructuring Agreement.  As set forth in greater detail in the Scheme Circular, the Restructuring will then take place pursuant to the terms of the Scheme, the Restructuring Agreement (the "**Restructuring Agreement**") attached as **<u>Appendix 2</u>** to the Scheme, and other documents governing the Restructuring.

20.    Following the exhaustion of the collateral under the Indenture as a result of the Restructuring, all remaining liabilities against the Company arising under the Notes will be extinguished through operation of the Indenture pursuant to Section 6.06(a) thereof.  Such extinguished liabilities will include the remaining liabilities arising under the Class A Notes and the liabilities under the Class B Notes and the Class C Notes, which are junior to the Class A Notes.  In addition, the Class D Notes will similarly be extinguished pursuant to the terms of the instrument governing the Class D Notes.

21.    As part of the Restructuring and pursuant to the Scheme, the Release Agreements (as defined in the Scheme Circular) will be executed pursuant to which the Scheme Creditors will (a) confirm, amongst other things, their agreement to the cancellation of any claim(s), whether present or future, known or unknown, prospective or contingent, arising directly or indirectly out of or in connection with the Class A Notes, the Indenture and any claim(s) in respect of any liability of the Company arising out of or in connection therewith (and including, for the avoidance of doubt, any and all interest, make-whole amounts, premium, principal, fees and commission accruing on, or payable in respect of, such claim(s) or rights), and (b) agree, among other things, not to make any claims against the Company and/or the

Released Parties to be detailed in the relevant release agreements in respect of any claim they have or may have against each or all of the Released Parties or property belonging to any of the Released Parties and not to make any claim (save for certain allowed proceedings) against any Released Party which imposes or attempts to impose upon any of them any liability whatsoever in connection with the implementation of the Scheme.

22.    The Restructuring provides the following key benefits to Scheme Creditors: (i) immediate return of capital under the Restructuring versus no accelerated return of capital under the status quo; (ii) elimination of the risk associated with the future performance and reinsurance cash flows of the Defined Block of Business; (iii) ability to monetize a distressed and illiquid debt security; and (iv) in the case of the Ambac Guaranteed Scheme Creditors, the early settlement of a long-dated claim against Ambac in respect of the projected shortfall to principal at the maturity date of their Class A Notes, and elimination of the credit risk associated with Ambac's ability to meet such claims at that later date.

23.    Additional information about the Scheme and Restructuring is set forth in the Scheme Circular, which serves a comparable function with respect to the Scheme that a disclosure statement serves with respect to a chapter 11 plan.

24.    In connection with the Restructuring, recognition of the Scheme as a foreign main proceeding under chapter 15 of the Bankruptcy Code is necessary to facilitate the following objectives of the Restructuring:

- Ensuring that all of the Class A Noteholders affected by the Scheme are treated consistently, regardless of whether they are located in Ireland, the United Kingdom or the United States;

- Protecting Ballantyne and its property (including the Surplus Account and Reinsurance Trust Account), as well as the Trustee, from seizure or any lawsuits in the United States from those who are bound by the terms of the Scheme;

11

- Ensuring that the Releases approved by the Irish Court through its sanction of the Scheme will be enforceable within the United States; and

- Minimizing the risk of litigation over any potential residual claims that might exist under the Indenture in respect of the Notes issued thereunder, which is governed by New York law.

25.     After the Restructuring is implemented, the Restructuring Agreement contemplates that Ballantyne will enter into a solvent liquidation in accordance with Irish law. This will allow for a clean wind-up to the Restructuring and to Ballantyne's operations as a special purpose vehicle, and will help ensure finality to the contemplated transactions.  The costs of Ballantyne's solvent liquidation will be administered through the Holding Period Trust.

**D.     Commencement of Scheme Convening Proceeding and Restructuring Process**

26.     On April 25, 2019, the Debtor commenced the Scheme Convening Proceeding by filing an Originating Notice of Motion with the Irish Court seeking, *inter alia*, entry of the Convening Order (as defined below).  A substantially finalized draft scheme circular (the "**Scheme Circular**") was filed with the Irish Court concurrently with the Originating Notice of Motion as an exhibit to a grounding affidavit and was supplemented by the final version as an exhibit to a further affidavit prior to the hearing.  The Scheme Circular includes a copy of the Scheme in Part H thereof.  A copy of the Scheme Circular as issued by Ballantyne on April 30, 2019 (following the Convening Hearing (as defined below)), together with all exhibits thereto, is attached as **<u>Exhibit B</u>** to the Rynn Declaration.

27.     A hearing before the Irish Court was held on April 29, 2019 (the "**Convening Hearing**"), following which the Irish Court issued an order (the "**Convening Order**") to convene meetings of the relevant classes of creditors (the "**Scheme Creditors**") who will be subject to the Scheme if approved (the "**Scheme Meetings**"), consisting of a meeting of the Ambac Guaranteed Scheme Creditors and a separate meeting of the Assured Guaranty/A-1

Scheme Creditors (each as defined in the Scheme Circular).  The Scheme Meetings will be held on May 22, 2019.  A copy of the Convening Order is attached to the Rynn Declaration as **Exhibit A** thereto.

28.     In the Convening Order, the Irish Court also confirmed the appointment of the Foreign Representative by the Company to act as the foreign representative for purposes of achieving recognition of the Scheme in the United States.  Convening Order ¶ 7 (ordering "[t]hat the appointment of Adrian Masterson who was appointed by the Board of the Company on 24 April 2019 be confirmed to serve as foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code with respect to the Scheme, or if for any reason he is unable to act, Bill Cunningham or such other appropriate person selected by the Board of the Company, be authorised to act as foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code in relation to the Scheme.").

29.     On April 30, 2019, and in accordance with the Convening Order, notice of the Scheme Meetings was sent to the Scheme Creditors through DTC by means of the Notice of Scheme Meetings in the form contained in the Scheme Circular, and the Scheme Circular was made available to the Scheme Creditors on the following website: www.lucid-is.com/balre.  In addition, the Convening Order required Ballantyne to advertise the Scheme Meetings in the following publications: (i) *Iris Oifigiúil*, the official Irish state gazette, (ii) *The Irish Times*, (iii) *The Irish Independent* and (iv) *The Financial Times* (U.S. and EU Editions).  The Debtor separately made an RNS announcement regarding the convening of the Scheme Meetings on April 29, 2019 shortly after the Convening Hearing.

30.     Scheme Creditors are entitled to attend the relevant Scheme Meeting in person, by authorized representative (if a corporate entity) or by proxy and to ask questions

regarding the proposed scheme of arrangement. The provisions of the Convening Order specify that the Scheme Meetings will be chaired by Mr. Masterson, and the Scheme Creditors will have the opportunity to raise questions and objections to the Scheme at the Scheme Meetings.

31.     At each Scheme Meeting, a vote will be held to determine whether the Scheme Creditors in the applicable class that are present and voting in person or by proxy at such Scheme Meeting approve the Scheme and the Restructuring embodied by a greater than 50% majority in number representing at least 75% in value of the Scheme Creditors present and voting either in person or by proxy at the Scheme Meetings. If either Scheme class does not approve the scheme (by the requisite majorities described in the foregoing sentence), the Scheme cannot be sanctioned by the Irish Court and will not take effect. In other words, non-consenting affected creditors can be bound by the terms of the Scheme only if all of the classes of affected scheme creditors vote in favor of the Scheme. Thus, unlike the confirmation provisions of chapter 11 of the Bankruptcy Code, cramdown is not permissible so long as there is an impaired non-consenting class.

32.     If the Scheme is approved at each Scheme Meeting by the requisite majorities of the Scheme Creditors in the applicable class voting at such Scheme Meeting, a hearing before the Irish Court seeking sanction and approval of the Scheme is expected to be held on or about June 5, 2019 (the "**Sanction Hearing**"), as provided for in the Convening Order. The Scheme Creditors and other creditors of the Debtor (including holders of Class B, Class C or Class D Notes) will have an opportunity to be heard and raise objections at the Sanction Hearing, as part of the Scheme Sanction Proceeding.

33.     Assuming the Irish Court deems it appropriate to enter an order at the Sanction Hearing (the "**Sanction Order**," and collectively with the Convening Order and any

other order that may be entered by the Irish Court, the "**Irish Orders**"), the Sanction Order is expected, among other things, to (i) sanction and approve consummation of the Scheme and therefore entry into the Restructuring Agreement attached thereto, including all actions necessary to consummate the Restructuring; (ii) authorize the Trustee, and Ballantyne on behalf of the Scheme Creditors, to execute all agreements and documentation necessary to consummate the Restructuring as set forth in the Scheme and the Restructuring Agreement; and (iii) authorize and empower the Releases set forth in the Scheme, including the release of the Ambac Financial Guarantees.  However, recognition and enforcement of the Scheme under chapter 15 by this Court is a condition precedent to the implementation of the Restructuring and the restructuring steps under the Scheme and the Restructuring Agreement, a copy of which is annexed to the Scheme.  Accordingly, Ballantyne, along with the parties to the Lock-Up Support Agreement, intend to consummate the Restructuring shortly after the Sanction Order and an order of this Court recognizing and enforcing the Scheme under chapter 15 of the Bankruptcy Code are each entered.

## **BASIS FOR RELIEF REQUESTED**

34.    The Foreign Representative and the Debtor seek to fully implement the terms of the Scheme to effectuate the Restructuring.  Towards that end, the Scheme, the Restructuring Agreement and the Sanction Order, including the Releases, must be binding and enforceable in the United States, and Scheme Creditors must be precluded from taking any actions in the United States that may frustrate the Restructuring effectuated by the Irish Proceeding.  Chapter 15 of the Bankruptcy Code is designed to, *inter alia*, protect and maximize the value of a foreign debtor's assets and to facilitate the rehabilitation of financially distressed businesses.  *See* 11 U.S.C. § 1501.

35.     Consistent with these principles, the Foreign Representative commenced this chapter 15 case to obtain recognition of the Irish Proceeding and to give full recognition and enforcement to the Sanction Order and the Scheme.  As provided in the Masterson Declaration, the Foreign Representative believes that this chapter 15 case will enable the Debtor to achieve the objectives of the Scheme by (i) ensuring that the parties in interest to the Restructuring, including Ballantyne, the Scheme Creditors and the Trustee, are treated in the United States consistent with the intentions of the Scheme; (ii) ensuring that the Releases are binding, valid and enforceable in the United States; and (iii) minimizing the risk of litigation over any potential residual claims that might exist under the Indenture.

36.     For the reasons set forth below and in the Supporting Documents, the relief sought herein is appropriate under chapter 15.

## A.      The Debtor Is Eligible for Chapter 15 Relief

37.     To be eligible for chapter 15 relief, the Debtor must meet the general eligibility requirements under section 109(a) of the Bankruptcy Code as well as the more specific eligibility requirements under section 1517(a) of the Bankruptcy Code.  In addition, the petition for recognition must meet the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).  As demonstrated below, the Debtor meets all eligibility requirements.

### 1.      The Debtor Meets General Eligibility Requirements of Section 109(a) of the Bankruptcy Code

38.     Section 103(a) of the Bankruptcy Code provides that chapter 1, which includes section 109(a), "appl[ies] in a case under chapter 15."  11 U.S.C. § 103(a).  Thus, the Debtor must meet the eligibility requirements of section 109(a) of the Bankruptcy Code to obtain relief under chapter 15.  Section 109(a) of the Bankruptcy Code provides that "[n]otwithstanding

any other provision of this section, only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). Thus, under section 109(a), a foreign debtor must reside or have a domicile, a place of business or property in the United States to be eligible to file a chapter 15 petition. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013).

39.    Section 109(a) of the Bankruptcy Code does not require a specific quantum of property in the United States, nor does it indicate when or for how long such property must have a U.S. situs. *See, e.g., In re Berau Cap. Res. Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015). Courts have accordingly held that bank accounts, attorney retainers deposited in New York, or causes of action owned by the foreign debtor with a situs in New York satisfy the "property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code. *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014) (finding that the debtor "had property in the United States in the form of a retainer[, which] is sufficient to satisfy the requirements of section 109(a) of the Bankruptcy Code," and that "the Foreign Representatives acted in good faith in transferring the funds to the Client Trust Account" to serve as a retainer); *In re Ocean Rig UDW Inc*., 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (citing a retainer held by New York counsel in a New York account as a factor satisfying section 109(a) of the Bankruptcy Code and establishing venue); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *In re U.S. Steel Canada Inc.*, No. 17-11519 (Bankr. S.D.N.Y. June 29, 2017)

17

(granting recognition of a case where the foreign representative had cited the presence of a retainer in New York as the basis for venue).

40.     Here, the Debtor satisfies the eligibility requirement of section 109(a). The Debtor has property in the United States, including in this jurisdiction.  Specifically, the Debtor has an interest in both the Reinsurance Trust Account and the Surplus Account (collectively, the "**Accounts**"), which are held in New York at The Bank of New York Mellon and contained approximately $1,169 million and $24 million, respectively, on December 31, 2018, and contain substantially similar amounts as of the date hereof.  Masterson Declaration ¶ 33.

41.     In addition, the Debtor has an interest in certain funds deposited with Davis Polk as a retainer for its services in connection with this chapter 15 case, which funds are held in a client trust account (the "**Retainer Account**") in New York, New York.  Masterson Declaration ¶ 33.  *See, e.g.*, *Octaviar*, 511 B.R. at 372–73 (Bankr. S.D.N.Y. 2014) ("There is a line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citing *In re Cenargo Int'l PLC*, 294 B.R. 571, 603 (Bankr. S.D.N.Y. 2003)); *see also In re Yukos Oil Co.*, 321 B.R. 396, 401–03 (Bankr. S.D. Tex. 2005); *In re Glob. Ocean Carriers*, 251 B.R. 31, 39 (Bankr. D. Del. 2000).

42.     Finally, the Indenture is governed by New York law, which contains provisions submitting the parties to the jurisdiction of New York state and federal courts.  Masterson Declaration ¶ 33.  Indentures containing jurisdiction provisions of this type have separately been found to give rise to property rights supporting debtor eligibility under section 109(a) of the Bankruptcy Code.  *See, e.g.*, *In re Avanti Commc'ns*, 582 B.R. 603, 610–611

(Bankr. S.D.N.Y. 2018) (holding that a foreign debtor was eligible to be a debtor under section 109(a) of the Bankruptcy Code because of intangible contract rights under a New York law–governed indenture); *Berau*, 540 B.R. at 83–84 (same).

43.     Accordingly, the Debtor meets the general eligibility requirements of section 109(a) of the Bankruptcy Code.

### 2.     The Debtor Meets Specific Eligibility Requirements of Section 1517(a) of the Bankruptcy Code

44.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, "an order recognizing a foreign proceeding shall be entered if . . . (1) such foreign proceeding for which recognition is sought is a foreign main proceeding . . . within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Each of those requirements has been satisfied.

### (a)     The Irish Proceeding Is a Foreign Proceeding Within the Meaning of Section 1502 of the Bankruptcy Code

45.     This Court has previously recognized an Irish scheme of arrangement as a foreign main proceeding for the purposes of chapter 15 of the Bankruptcy Code. *In re Chartis Excess Ltd.*, No. 13-10888 (SHL) (Bankr. S.D.N.Y. May 01, 2013) (ECF No. 15). Furthermore, the legal structure governing Irish schemes of arrangement is similar to that governing schemes of arrangement under the laws of the United Kingdom. *See* Rynn Declaration ¶ 27. Courts have consistently recognized schemes of arrangement in the United Kingdom as foreign proceedings. *See Avanti*, 582 B.R. at 619; *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. Nov. 11, 2016) (ECF No. 14); *In re YH Ltd.*, No. 16-12262 (SCC) (Bankr. S.D.N.Y. Sept. 8, 2016) (ECF No. 14); *In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*, No. 15-13054 (SCC) (Bankr. S.D.N.Y. Jan. 11, 2016) (ECF No. 18); *In*

*re Towergate Fin. Plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF No. 16); *In re B. Endeavour Shipping Co. Ltd.*, No. 15-10246 (REG) (Bankr. S.D.N.Y. Mar. 10, 2015) (ECF No. 10).   More generally, the scheme of arrangement structure is provided for in the legal regimes of a number of different countries, and "U.S. bankruptcy courts have routinely recognized them as 'foreign proceedings.'"   David L. Lawton and Shannon B. Wolf, *The Thing about Schemes in the Scheme of Things: Recognition of Schemes of Arrangement under Chapter 15 of the U.S. Bankruptcy Code*, at 1 (INSOL International Technical Series Issue No. 38, March 2018).

46.     Finally, given the routine recognition of schemes of arrangement in various countries, it should be unsurprising that the Irish Proceeding meets all the elements of the definition of a "foreign proceeding" under the Bankruptcy Code.   Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."   11 U.S.C. § 101(23).   The Irish Proceeding meets each element of this definition because (i) it is a proceeding that is (ii) either judicial or administrative in character, (iii) collective in nature, (iv) in a foreign country, (v) authorized or conducted under a law related to insolvency or the adjustment of debts, (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court, and (vii) for the purpose of reorganization or liquidation.   Each of these elements is addressed separately below.

*(i)     The Foreign Proceeding Is a Proceeding*

47.     The hallmark of a "proceeding" is a "statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets" and includes

20

"acts and formalities set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice." *In re Betcorp Ltd.*, 400 B.R. 266, 277–78 (Bankr. D. Nev. 2009). The Foreign Proceeding is governed by the statutory framework set forth in the Part 9 of the Companies Act 2014 (as amended, the "**Companies Act**"). Specifically, as described in more detail in the Rynn Declaration, the Companies Act specifies the acceptable procedures for implementing an Irish scheme, including commencing the scheme, designating classes of creditors, holding meetings and voting. *See* Rynn Declaration ¶¶ 13–21. The Companies Act also set forth the standards for approval of Irish schemes by the applicable Irish court. *See* Rynn Declaration ¶¶ 22–26. Moreover, in this case, the Convening Order mandated that all creditors of the Debtor receive a copy of the Scheme Circular that provided notice and disclosure regarding the procedures to take place in the Scheme. *See* ¶ 38(iv). The Irish Proceeding is therefore a "proceeding" because the Companies Act falls within the type of specific statutory framework described in the case law. *See, e.g.*, *Betcorp*, 400 B.R. at 277–78.

           *(ii)*        *The Foreign Proceeding Is Judicial or Administrative in Character*

        48.     Second, the Irish Proceeding is judicial in character. In *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 52 (Bankr. S.D.N.Y. 1999), this Court stated, "there is significant judicial involvement in this scheme process" with respect to a scheme of arrangement under the laws of a different country (Bermuda) based on factors that are also present with respect to the Scheme. Specifically, the *Hopewell* decision looked to the following elements of the scheme of arrangement process as demonstrating that it was judicial in character:

> There are two mandatory court appearances, the first, on the *ex parte* summons to convene the class meetings and the second, on the sanctioning of the scheme. . . . Both hearings required the court to review the materials submitted and evaluate them. . . . With regard to the second hearing, . . . the court plays a significant role in that it must assure itself that the scheme is in the best interests of creditors and members. Lastly, creditors and members had a plethora of opportunities to object to the scheme before it was sanctioned . . . .

*Id.*  Here, the Irish Court, a judicial body of Ireland, has issued the Convening Order, pursuant to which it directed the Company to convene the Scheme Meetings, after determining that the Scheme complied with the applicable provisions of the Companies Act, including that the proposed voting classes were acceptably defined.  *See* Rynn Declaration ¶ 40.  The completion of the Scheme process will require the Irish Court to hold the Sanction Hearing, at which all creditors will have the opportunity to raise objections.  *See* Rynn Declaration ¶¶ 22–26.  To sanction the Scheme, the Irish Court must be satisfied, *inter alia*, that an intelligent and honest person, being a member of the relevant class of scheme creditors concerned and acting in respect of his interests, might reasonably approve it.  *See* Rynn Declaration ¶ 24(v).  Absent the Irish Court's sanction, the Company cannot implement the Scheme.  *See* Rynn Declaration ¶ 11(v). Accordingly, the involvement of the Irish Court in the process for approving the Scheme closely parallels the involvement of the relevant foreign court in *Hopewell*.  The Irish Proceeding is therefore judicial in character.

*(iii)*      *The Foreign Proceeding Is Collective in Nature*

49.    A proceeding is "collective" if it considers the rights and obligations of all creditors.  *See In re ABC Learning Centres Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir. 2013); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018).  Here, once the Scheme becomes effective, it will be binding on all Scheme Creditors.  *See* Rynn Declaration ¶¶ 8, 26.  All Scheme Creditors (other than those who specifically agreed, with the consent of the Company, to waive their voting rights as part of the Restructuring) had the opportunity to attend and vote at the Scheme Meetings, subject to compliance with the applicable procedures specified in the Convening Order.  *See* Rynn Declaration ¶¶ 13, 19, 40(vi).  Moreover, the Irish Court determined with respect to each voting

22

class of Scheme Creditors that any differences in their legal rights with respect to the Company, both before and after the effectiveness of the Scheme, did not make it impossible for them to consult together in relation to the proposed compromise or arrangement with a view to their common interest, as required by the Companies Act.  *See* Rynn Declaration ¶ 14.  The Scheme is therefore collective in nature.

*(iv)        The Foreign Proceeding Is Located in a Foreign Country*

50.    The Company is incorporated in Ireland, the Debtor's primary operations take place in Ireland and the Debtor's board of directors, its sole management as a special purpose vehicle, are located in, hold meetings in, and run the Debtor's operations in Ireland.  *See* Masterson Declaration ¶¶ 5–6.  The Convening Hearing was held before the Irish Court in Ireland, the Scheme Meetings will take place in Ireland, and the Sanction Hearing will be held before the Irish Court in Ireland.  *See* Rynn Declaration ¶ 40.  Therefore, there can be no doubt that the Irish Proceeding is located in Ireland, a foreign country.

*(v)        The Foreign Proceeding Is Authorized or Conducted Under a Law
Related to Insolvency or the Adjustment of Debts*

51.    A scheme of arrangement under the Companies Act, like an English scheme, is a flexible mechanism that can be used to encompass a large variety of compromises or arrangements between a company and its creditors.  In particular, a scheme of arrangement can be used to restructure all or part of a company's debt.  *See* Rynn Declaration ¶ 9.  A scheme of arrangement under the Companies Act can be structured to have the effect of discharging a company's liabilities and, therefore, can facilitate winding up the company.  *See* Rynn Declaration ¶ 10.  As noted above, this Court has previously found an Irish scheme to be authorized or conducted under a law related to insolvency or the adjustment of debts.  *In re Chartis Excess Limited*, No. 13-10888 (SHL) (Bankr. S.D.N.Y. May 01, 2013) (ECF No. 15).

Moreover, this Court has also recognized many similarly structured schemes of arrangement under the laws of the United Kingdom, thereby confirming that they satisfy this requirement. *See* Rynn Declaration ¶ 27; *Avanti*, 582 B.R. at 619; *In re EnQuest PLC*, No. 16-12983 (MEW) (Bankr. S.D.N.Y. Nov. 11, 2016) (ECF No. 14); *In re YH Ltd.*, No. 16-12262 (SCC) (Bankr. S.D.N.Y. Sept. 8, 2016) (ECF No. 14); *In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*, No. 15-13054 (SCC) (Bankr. S.D.N.Y. Jan. 11, 2016) (ECF No. 18); *In re Towergate Fin. Plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF No. 16); *In re B. Endeavour Shipping Co. Ltd.*, No. 15-10246 (REG) (Bankr. S.D.N.Y. Mar. 10, 2015) (ECF No. 10).

> ### (vi)    Under the Foreign Proceeding, the Debtor's Assets and Affairs Are Subject to the Control or Supervision of a Foreign Court

52.    "[T]he requirement that the debtor's assets be subject to the control and supervision of a foreign court does not require that the foreign proceedings play out entirely in a judicial context like cases under the Bankruptcy Code.  The ability of a party to ask for court assistance concerning the proceeding is sufficient to satisfy this element." 8 Collier on Bankruptcy ¶ 1501.03 (16th ed. 2018); *see also In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 640 (Bankr. S.D.N.Y. 2018) (finding a proceeding subject to supervision of a foreign court where the court's approval was required to initiate or terminate the proceeding, modify certain contracts to which the debtor was party and compensate estate professionals).  Here, the Irish Court plays a significantly larger role than this minimum requirement.  Specifically, the Irish Court possesses the authority to sanction (or decline to sanction) the Scheme following the Sanction Hearing, and thereby determine whether or not the Company will obtain the relief sought.  *See* Rynn Declaration ¶ 11(v).  Therefore, no contract or obligation of the Company may be modified pursuant to the Scheme without approval of the Irish Court.  In addition, Scheme Creditors and other creditors will have the opportunity to seek the assistance of the Irish Court by

24

raising objections at the Sanction Hearing.  *See* Rynn Declaration ¶ 22.  Moreover, the Scheme

provides that Irish courts, including the Irish Court, will have exclusive jurisdiction to hear and

determine any suit, action or proceeding, and to settle any dispute which arises out of or in

connection with the terms of the Scheme or its implementation or out of any action taken or

omitted to be taken under the Scheme or in connection with the administration of the Scheme.

*See* Scheme Circular Part H (the Scheme) Section 4.7.2.  The Scheme is therefore subject to the

control or supervision of a foreign court.

(vii)  *The Foreign Proceeding Is for the Purpose of Reorganization or Liquidation of the Debtor.*

53. Here, as a result of the Restructuring, of which the Scheme is an integral

component, the Company's assets will be liquidated and used to fund the costs of the Novation, a

ceding commission to the New Reinsurer, satisfaction of certain costs of the Restructuring and a

distribution to the Class A Noteholders in full and final satisfaction of their Class A Notes, as

described in more detail above.  After completing the Reorganization, the Company will be

wound up.  *See* Scheme Circular, Section D.10.  The Foreign Proceeding is therefore a

proceeding for the purposes of reorganization or liquidation.  Moreover, this Court has

previously recognized an Irish scheme of arrangement that was a necessary component of the

process designed to wind up an Irish company as a proceeding for the purposes of reorganization

or liquidation.  *In re Chartis Excess Limited*, No. 13-10888 (SHL) (Bankr. S.D.N.Y. May 01,

2013) (ECF No. 15).

(b)  *The Foreign Proceeding Is a "Foreign Main Proceeding"*

54. Under section 1502(4) of the Bankruptcy Code, the term "foreign main

proceeding" means "a foreign proceeding pending in the country where the debtor has the center

of its main interests" ("**COMI**").  *See, e.g., In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir.

25

2013) (affirming recognition of foreign main proceeding); *In re Ocean Rig UDW Inc.*, 570 B.R.

687, 705 (Bankr. S.D.N.Y. 2017) (recognizing foreign main proceeding); *In re Suntech Power*

*Holdings Co.*, 520 B.R. 399, 416–17 (Bankr. S.D.N.Y. 2014) (same).  Absent evidence to the

contrary, a debtor's registered office is presumed to be its COMI.  11 U.S.C. § 1516(c).  *See also*

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122,

130 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).  Here, the Debtor's registered

office is located in Ireland, creating a presumption that Ireland is the COMI for the Debtor.

55.    Although this presumption that Ireland is the COMI of the Debtor is

rebuttable, here other relevant factors to be considered also point to Ireland.  Specifically, courts

consider a variety of factors including "the location of the debtor's headquarters," "the location

of the debtor's primary assets," "the location of the majority of the debtor's creditors or of a

majority of the creditors who would be affected by the case" and "the jurisdiction whose law

would apply to most disputes."  *In re Fairfield Sentry Ltd.*, 714 F.3d at 137 (quoting *In re SphinX,*

*Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007)).  Here, the

Debtor's board of directors, its sole management as a special purpose vehicle, are located in,

hold meetings in, and run the Debtor's operations in Ireland.  *See* Masterson Declaration ¶ 5–6.

Given the limited nature of the Debtor's operations and that the Debtor's primary assets, in the

form of the Accounts, are located in the United States, there is no other foreign country that

could even be considered as a candidate to be the Debtor's COMI.  *See* Masterson Declaration

¶ 33.  Accordingly, because the Debtor's COMI is located in Ireland, the Irish Proceeding is a

foreign main proceeding and thus the first element of section 1517(a) of the Bankruptcy Code is

satisfied.

      (c)        *The Chapter 15 Case Has Been Commenced by a Duly Authorized Foreign Representative*

56.      The Foreign Representative is duly authorized to serve in its capacity as a foreign representative in this chapter 15 case and, as such, satisfies the second condition for entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.  The term "foreign representative" is defined under section 101(24) of the Bankruptcy Code as:

> a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

57.      Here, both the Irish Court and the Debtor concur with respect to the appointment of the Foreign Representative.  The Irish Court in the Convening Order expressly ratifies the appointment of the Foreign Representative by the board of directors to act as the foreign representative and authorizes him to apply for recognition of the Irish Proceeding in the United States pursuant to chapter 15 of the Bankruptcy Code.  Convening Order ¶ 7 (ordering "[t]hat the appointment of Adrian Masterson who was appointed by the Board of the Company on 24 April 2019 be confirmed to serve as foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code with respect to the Scheme, or if for any reason he is unable to act, Bill Cunningham or such other appropriate person selected by the Board of the Company, be authorised to act as foreign representative in any proceedings under Chapter 15 of the United States Bankruptcy Code in relation to the Scheme."); *see also* Masterson Declaration ¶ 2; *In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that a board of directors may authorize a person to act as the foreign

representative in a chapter 15 proceeding); *In re Compania Mexicana de Aviacion, S.A. de C.V.*,

No. 10-14182 (MG) (Bankr. S.D.N.Y. Nov. 8, 2010) (ECF No. 261) (same).

58.     Accordingly, Adrian Masterson is a proper "foreign representative" within

the meaning of section 101(24) of the Bankruptcy Code.  *See* 11 U.S.C. § 1516(a) ("If the

decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a

foreign representative, the court is entitled to so presume."); *In re SphinX, Ltd.*, 351 B.R. 103,

116–17 (Bankr. S.D.N.Y. 2006), *aff'd, Krys v. Official Comm. of Unsecured Creditors of Refco

Inc. (In re SphinX Ltd.)*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) of

Bankruptcy Code was satisfied where foreign representatives submitted a "copy of the Cayman

Court's order appointing them to administer the [d]ebtors' winding up under [Cayman law] and

authorizing their commencement of these chapter 15 cases").

### 3.     The Petition for Recognition Meets the Requirements of Section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4)

59.     This chapter 15 case was duly and properly commenced as required by

section 1504 of the Bankruptcy Code by filing a petition for recognition pursuant to section

1515(a) of the Bankruptcy Code.  Pursuant to section 1515(b) of the Bankruptcy Code, a petition

for recognition must be accompanied by one of the following:

a     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

b     a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

c     in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

60.     A certified copy extract of the minutes of a meeting of the Debtor's board

of directors reflecting the appointment of the Foreign Representative is attached to the Masterson

Declaration as **Exhibit A** thereto. In addition, a copy of the Convening Order commencing the Irish Proceeding is attached to the Rynn Declaration as **Exhibit A** thereto. The Convening Order, among other things, confirms the appointment of the Foreign Representative as the foreign representative.

61.     The petition for recognition was filed accompanied by all fees, documents and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), including (i) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (ii) a list containing (a) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtor, (b) all parties to litigation pending in the United States in which the Debtor is a party at the time of the filing of this chapter 15 case and (c) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (iii) a statement identifying all foreign proceedings with respect to the Debtor that are known to the Foreign Representative and (iv) a certified copy of the Convening Order. *See Lists Pursuant to Federal Rules of Bankruptcy Procedure 1007(A)(4) and 7007.1 and Local Rule 1007-3*, filed herewith. *See also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code."), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

62.     Having filed the above-referenced documents and because the Court is entitled to presume the authenticity of such documents filed in connection with the petition for recognition under section 1516(b) of the Bankruptcy Code, the requirements of section 1515 of

the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) have been met and this chapter 15 case

was properly commenced.  *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Bankruptcy Rule 1007(a)(4).

63.     As demonstrated above, the Debtor also meets both the general eligibility

requirements of section 109(a) of the Bankruptcy Code and the specific eligibility requirements

of section 1517(a) of the Bankruptcy Code.  Therefore, the Debtor is eligible for chapter 15 relief.

**B.     Enforcement of Sanction Order and Scheme, Including Releases Therein, and
         Related Discretionary Relief Pursuant to Sections 1521, Including Entrustment for
         Distribution to Effectuate the Scheme, Is Proper**

64.     The Foreign Representative respectfully requests that the Court (i) provide

for enforcement in the United States of the Scheme and the Irish Orders, including provisions

therein approving the Scheme and the Releases pursuant to section 1521(a), and (ii) entrust to the

Foreign Representative the administration, realization and distribution of all assets of the Debtor

within the territorial jurisdiction of the United States pursuant to sections 1521(a)(5) and 1521(b)

of the Bankruptcy Code.   The Foreign Representative seeks such entrustment only for the

purposes of ensuring that he may ratify the Debtor's continued use of the Accounts, including for

purposes of effectuating the transactions contemplated by the Restructuring, which will result in

the distribution of funds from the Accounts pursuant to the terms of Restructuring Agreement,

including certain transfers of funds out of the United States, as described in greater detail above.

65.     Upon recognition of a foreign proceeding as a foreign main proceeding,

certain provisions of the Bankruptcy Code are made applicable to a chapter 15 case as a matter

of right pursuant to section 1520 of the Bankruptcy Code.  In addition to these protections, a

Foreign Representative may request additional "appropriate relief" pursuant to section 1521(a) of

the Bankruptcy Code, including "any additional relief that may be available to a trustee, except

for relief available under section 522, 544, 545, 547, 548, 550, and 724(a) [of the Bankruptcy

Code]."  11 U.S.C. § 1521(a)(7).  Section 1521(a) of the Bankruptcy Code authorizes the Court

to grant "any appropriate relief" to a foreign representative "where necessary to effectuate the
purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors,"
provided that the interests of creditors and other interested entities are sufficiently protected.  11
U.S.C. §§ 1521(a), 1522(a); *see also Avanti*, 582 B.R. at 612 ("The discretion that is granted is
exceedingly broad, since a court may grant any appropriate relief that would further the purposes
of chapter 15 and protect the debtor's assets and the interests of creditors.") (internal citations
omitted).  Such relief may include:

> (1) staying the commencement or continuation of an individual action or
> proceeding concerning the debtor's assets, rights, obligations or liabilities to
> the extent they have not been stayed under section 1520(a);
>
> (2) staying execution against the debtor's assets to the extent it has not been
> stayed under section 1520(a);
>
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets
> of the debtor to the extent this right has not been suspended under section
> 1520(a);
>
> (4) providing for the examination of witnesses, the taking of evidence or the
> delivery of information concerning the debtor's assets, affairs, rights,
> obligations or liabilities;
>
> (5) entrusting the administration or realization of all or part of the debtor's assets
> within the territorial jurisdiction of the United States to the foreign
> representative or another person, including an examiner, authorized by the
> court;
>
> (6) extending relief granted under section 1519(a); and
>
> (7) granting any additional relief that may be available to a trustee, except for
> relief available under sections 522, 544, 545, 547, 548, 550 and 724(a).

11 U.S.C. § 1521(a).

66.    The Court's authority to grant each form of relief requested pursuant to

Section 1521 is subject to the same two overlapping conditions because section 1521(a) provides

that any relief granted pursuant to section 1521 must be "necessary to effectuate the purposes of

[chapter 15] and to protect the assets of the debtor," and the Court must be satisfied that "the

interests of creditors and other interested entities, including the debtor, are sufficiently protected."
11 U.S.C. § 1522(a).

67.    A determination of sufficient protection "requires a balancing of the respective parties' interests." *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y. 2013) (citing *SNP Boat Serv. S.A. v. Hotel Le St. James*, 483 B.R. 776, 784 (S.D. Fla. 2012); *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 556–58 (E.D. Va. 2010); *CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012)).   Courts have also explained "sufficient protection" as:

> embodying three basic principles: '[(i)] the just treatment of all holders of claims against the bankruptcy estate, [(ii)] the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and [(iii)] the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law.'

*In re ENNIA Caribe Holding N.V.*, No. 18-12908 (MG) 2019 WL 365749, at *5 (Bankr. S.D.N.Y. Jan. 29, 2019) (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (quoting *In re Artimm, S.r.L.*, 335 B.R. 149, 160 (Bankr. C.D. Cal. 2005))).

68.    Here, both the three-factor *Atlas Shipping* test and the general balancing test favor granting the requested relief.

### 1.    *Just Treatment of All Holders of Claims Against or Interests in the Debtor's Property*

69.    The requirement to reasonably assure "just treatment of all holders of claims against or interests in the debtor's property" is satisfied where the foreign insolvency law provides a comprehensive procedure for the orderly resolution of claims and the equitable distribution of assets among all of the estate's creditors in one proceeding.  *See, e.g.*, *In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 170 (2d Cir. 2008) ("The 'just treatment' factor is satisfied upon a showing that the applicable law 'provides for a comprehensive procedure for the

orderly and equitable distribution of [the debtor]'s assets among all of its creditors'") (citing *In re Treco*, 240 F.3d 148, 158 (2d Cir. 2001)); *In re Culmer*, 25 B.R. 621, 629 (Bankr. S.D.N.Y. 1992).

70.     Here, the implementation of the Scheme, a material element of which is the enforcement of the plain terms of the provisions of an Indenture governed by New York law, will result in the distribution of the Debtor's assets in the Restructuring as described in greater detail above and in the Scheme Circular.  The Restructuring will result in the same treatment for each Scheme Creditor as other similarly situated Scheme Creditors.  Moreover, the terms of the Scheme require approval of the Irish Court in the form of the Sanction Order.  Hence, the Scheme and Sanction Order, once entered, will be the result of a proceeding (the Irish Proceeding) in which all creditors were treated fairly and justly, in compliance with Irish law.

### 2.      *Protection of Claim Holders in the United States Against Prejudice and Inconvenience in the Processing of Claims in the Foreign Proceeding*

71.     The Scheme addresses only the claims of the Scheme Creditors, and there is no need for any Scheme Creditor to file a claim in the Irish Proceeding to receive the same treatment as other similarly situated Scheme Creditors.  Accordingly, no creditor in the United States will be required to process a claim in the foreign proceeding and accordingly are not inconvenienced thereby.  In any event, all Scheme Creditors were given notice of the Scheme, and the process for participating in or objecting to the Scheme is the same for United States creditors as all other creditors.  To the extent participating in or objecting to the Scheme is analogous to filing a claim, this factor is satisfied.  *C.f. In re Treco*, 240 F.3d at 158; *In re Petition of Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995) (holding that this factor is satisfied where creditors are given adequate notice of timing and procedures for filing claims, and such procedures do not create any additional burdens for a foreign creditor to file a claim).

### 3.    Distribution of Proceeds Substantially in Accordance with the Bankruptcy Code

72.    The third factor considers whether distribution of the Debtor's property will substantially accord with the order of distribution available under the Bankruptcy Code. The "substantially in accordance" factor does not require that the foreign distribution be identical to United States bankruptcy law.  *In re Ionica*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) ("Section 304(c)(4) only requires that the foreign distribution scheme be 'substantially in accordance' with United States bankruptcy law; it does not have to mirror the United States distribution rules.") (citations omitted).

73.    Here, as described in more detail above and in the Scheme Circular, the Debtor's property will primarily be distributed pursuant to the terms of an Indenture governed by New York law, subject to turnover of costs and expenses of the Restructuring pursuant to the Scheme, including (a) Restructuring costs and adviser fees, (b) expenses of the Scheme and the Restructuring, (c) the Ambac Claim Transfer Payment (as defined in the Scheme) and (d) the Lock-Up Fee payable to applicable consenting Class A Noteholders party to the Lock-Up Support Agreement.  Payment of such costs and expenses of a restructuring prior to distributions to creditors frequently occurs in proceedings under chapter 11 of the Bankruptcy Code and therefore are "substantially in accordance" with United States bankruptcy law.

### 4.    The General Balancing Test Weighs in Favor of Granting Relief

74.    With respect to the general balancing test, the Company and the Scheme Creditors have a strong interest in the availability of a means to determine how property will be distributed in a collective proceeding because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding." *Atlas Shipping*, 404 B.R. at 737.  As discussed above, the Scheme is an appropriate mechanism to achieve this important goal.  The requested relief, including enforcement of the Scheme, the

Releases, and entrustment for distribution, is necessary to effectively utilize this mechanism. Moreover, sanction of the Scheme requires that a greater than 50% majority in number of Scheme Creditors, representing at least 75% in value of the aggregate amounts outstanding under the Class A Notes present and voting at each of the Scheme Meetings, vote in favor of the Scheme. Such creditors have a significant interest in receiving the benefits of the proposed Restructuring, of which the Scheme is an integral component. On the other side of the ledger, any objecting creditors will still receive the same treatment as other similarly situated creditors and will benefit from the procedural protections available in the Irish proceeding, so such creditors' interests are protected. Moreover, the Company's primary creditors in the United States are holders of Notes that were issued in connection with an offering circular that clearly identified the Company as an Irish company, subject to Irish proceedings including schemes of arrangement, so they had ample notice of the possibility of such a collective proceeding if the Company encountered financial difficulties. Accordingly, balancing the interests of the relevant parties strongly supports the conclusion that the relevant parties in interest are sufficiently protected.

75. Finally, the relief requested here clearly furthers the goals and purposes of chapter 15 itself. *See* 11 U.S.C. § 1501 (explaining that chapter 15's "objectives" include "cooperation between (A) courts of the United States . . . and (B) the courts and other competent authorities of foreign countries"). By ensuring that the Debtor can effectuate the terms of the Scheme, particularly with respect to distribution of Company property, once approved by the Irish Court, the relief requested "would assist in the efficient administration of this cross-border insolvency proceeding, and it would not harm the interests of the debtors or their creditors." *In re Grant Forest Prods., Inc.*, 440 B.R. 616, 621 (Bankr. D. Del. 2010).

76.     Accordingly, the Foreign Representative respectfully submits that enforcement of the Scheme, including the Releases therein, and entrustment of the Debtor's assets located in the United States to the Foreign Representative are necessary and appropriate.

**C.     Enforcement of the Scheme and Releases Is Also Proper Under Section 1507**

77.     The Court may act under section 1507 of the Bankruptcy Code to provide "additional assistance" to a foreign representative, provided that such assistance is "consistent with the principles of comity" and cooperation with foreign courts.  11 U.S.C. § 1507; *see also Avanti*, 582 B.R. at 615*; In re Atlas Shipping A/S*, 404 B.R. 726, 737–38 (Bankr. S.D.N.Y. 2009); *Bear Stearns*, 389 B.R 325, 333 (S.D.N.Y. 2008).

78.     In exercising discretion to grant relief under section 1507(a) of the Bankruptcy Code, courts are guided by the standards set forth in section 1507(b) of the Bankruptcy Code, which provide that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

> (1)     just treatment of all holders of claims against or interests in the debtor's property;

> (2)     protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

> (3)     prevention of preferential or fraudulent dispositions of property of the debtor;

> (4)     distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

> (5)     if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

79.     Subsection 1507(b) is clear that the principles of comity are key to a court's decision whether to grant additional assistance.  *See, e.g.*, *In re Metcalfe & Mansfield Alt. Inv.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative."); *In re Atlas Shipping*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (noting that post-recognition relief is "largely discretionary and turns on subjective factors that embody principles of comity") (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008)).  The general principles supporting granting comity in this case are discussed above.  Beyond such general principles of comity, each of the listed considerations in subsection 1507(b) also favors discretionary relief.

80.     Considerations (1), (2), and (4) are essentially the same as the three factors in the *Atlas Shipping* test set forth above.  Factor (5), provision of a "fresh start" does not apply here because the Debtor is a business entity.  *See In re Bd. of Dirs. of Telecom Arg., S.A.*, No. 05-17811 (BRL), 2006 WL 686867, n.11 (Bankr. S.D.N.Y. Feb. 24, 2006); *In re Culmer*, 25 B.R. 621, 631 n.4 (Bankr. S.D.N.Y. 1982).

81.     The only remaining factor to be considered is therefore factor (3), "prevention of preferential or fraudulent dispositions of property of the debtor," which is satisfied here.  Dispositions of property pursuant to the Scheme may only occur after the Sanction Order is entered, which requires a determination by the Irish Court that the disposition of property contemplated by the Scheme is in accordance with Irish law and represents a compromise that an intelligent and honest person, being a member of the relevant class of scheme creditors concerned and acting in respect of his interests, might reasonably approve.

Accordingly, adherence to the well-recognized scheme of arrangement process and the supervision of the Irish Court is sufficient to safeguard to reasonably assure prevention of preferential or fraudulent dispositions of property of the debtor, so this factor is satisfied.

82.     Accordingly, standards set forth in section 1507(b) all weigh in favor of granting enforcement of the Scheme, including the Releases therein.

**D.     Enforcement of Foreign Plans and Releases Is Consistent with Principles of Comity**

83.     Courts have routinely held that recognizing and enforcing a foreign plan and confirmation order falls within the scope of the relief available under section 1521 and section 1507. *See, e.g.*, *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 551 (Bankr. S.D.N.Y. 2017); *In re Rede Energia S.A.*, 515 B.R. 69 (Bankr. S.D.N.Y. 2014). In particular, this Court has enforced an Irish scheme in the United States. *In re Chartis Excess Limited*, No. 13-10888 (SHL) (Bankr. S.D.N.Y. May 1, 2013) (ECF No. 15). Moreover, this Court has also explained in detail why a United Kingdom scheme of arrangement and associated sanction order may properly be recognized and enforced in the United States under this theory. *Avanti*, 582 B.R. at 619. The structure of United Kingdom schemes is similar to that of Irish schemes. *See* Rynn Declaration ¶ 27.

84.     The decision of whether to grant appropriate relief or additional assistance by enforcing a scheme and sanction order is "guided by principles of comity and cooperation with foreign courts." *Avanti*, 582 B.R. at 616. The need to extend comity to foreign proceedings is particularly salient with respect to proceedings such as the Irish Proceeding that determine how property will be distributed in a collective proceeding because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding" to bind all creditors and comprehensively effectuate a plan of reorganization. *Atlas Shipping*, 404 B.R. at 737 (quoting *Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709,

713–14 (2d Cir. 1987)); *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 539 (1883) ("Unless all parties . . . can be bound by the arrangement . . . the scheme may fail . . . . Under these circumstances, the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized . . . ."); *Victrix S.S. Co.*, 825 F.2d at 714 ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.").

85.    Comity is particularly important in the insolvency context notwithstanding the fact that recognition of a foreign restructuring proceeding may implicate certain rights under U.S. law.  For example, in *In re. Bd. of Dirs. of Telecom Arg., S.A.*, then Second Circuit Judge Sotomayor affirmed a bankruptcy court's order extending comity to Argentine insolvency proceedings, finding that those proceedings did not violate U.S. public policy considerations manifest in the Trust Indenture Act ("**TIA**").  528 F.3d 162, 165 (2d Cir. 2008).  The Second Circuit held that a bankruptcy court may grant enforcement of foreign insolvency proceedings that result in the restructuring of TIA-qualified notes so long as recognition of those proceedings is otherwise valid under then section 304 of the Bankruptcy Code.  Foreign insolvency proceedings can also modify payment terms under an indenture notwithstanding noteholders' TIA rights.  *See In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384 (Bankr.  S.D.N.Y. 2004).  Citing prior Supreme Court precedent, Judge Gropper rejected claims by noteholders:

> if foreign law can under certain circumstances trump the U.S. Constitution and preclude bondholders from enforcing their contractual rights, as *Gebhard* holds, there is no basis for adopting the principle espoused by [the noteholders], that foreign law can under no circumstances override § 316(b) of the Trust Indenture Act (except perhaps if the foreign law is identical in all respects to U.S. law).  Nor can *Gebhard* be limited to the effect of a foreign proceeding on State rather than Federal rights.  It is the seminal decision on granting comity to foreign insolvency proceedings.

39

*Id.* at 390.

86.    In that regard, the Supreme Court has held that a foreign judgment should

not be challenged in the United States if the foreign forum provides:

> [A] full and fair trial abroad before a court of competent jurisdiction, conducting
> the trial upon regular proceedings, after due citation or voluntary appearance of
> the defendant, and under a system of jurisprudence likely to secure an impartial
> administration of justice between the citizens of its own country and those of
> other countries, and there is nothing to show either prejudice in the court, or in the
> system of laws under which it is sitting . . . .

*Hilton* v. *Guyot*, 159 U.S. 113, 202–03 (1895); *Avanti*, 582 B.R. at 618–619 (extending comity to

a sanctioned scheme that: complied with applicable statutory requirements; fairly represented

creditors in classification; found the majority acted in a *bona fide* manner; was one that an

intelligent and honest man, acting in respect of his interests as a creditor, might reasonably

approve; and where jurisdiction was proper); *Metcalfe*, 421 B.R. at 698 (holding that a Canadian

order approving a release and injunction was enforceable in chapter 15 under principles of

comity because "[t]he U.S. and Canada share the same common law traditions and fundamental

principles of law.  Canadian courts afford creditors a full and fair opportunity to be heard in a

manner consistent with standards of U.S. due process.  U.S. federal courts have repeatedly

granted comity to Canadian proceedings."); *see also In re Sino-Forest Corp.*, 501 B.R. 655, 663–

64 (Bankr. S.D.N.Y. 2013) ("The same analysis [as *Metcalfe*], with the same conclusions,

applies here.").  Accordingly, claims that a foreign insolvency proceeding cannot be used to

release a non-debtor guarantor, even if such releases may not be available under U.S. law, have

been rejected as long as the aforementioned due process concerns are satisfied:  "Plaintiffs'

attempt to sue [the guarantor] here constitutes the sort of end-run around a parallel foreign

bankruptcy proceeding of which [the Second Circuit has] repeatedly disapproved."  *See Oui Fin.*

*LLC v. Dellar*, No. 12 CIV. 7744 (RA), 2013 WL 5568732, at *10 (S.D.N.Y. Oct. 9, 2013)

(extending comity to a French pre-insolvency proceeding which triggered an automatic event of default under a loan agreement and promissory note) (citation omitted).

87.     The Irish Proceeding easily meets the standard for extending comity.  The facts and circumstances here are very similar to those in *Metcalfe* and *Sino-Forest*.  The United States and Ireland share the same common law traditions and fundamental principles of law. Moreover, in the Irish Proceeding in particular, the Scheme Creditors have a full and fair opportunity to vote on and be heard in connection with the Scheme, in a manner consistent with U.S. standards of due process.  *See* Rynn Declaration ¶¶ 18, 26.  The Scheme, similar to United Kingdom schemes, requires a greater than 50% majority in number representing not less than 75% in value of each class of Scheme Creditor present and voting at the relevant Scheme Meetings to vote in favor of the Scheme to be legally binding.  *See* Rynn Declaration ¶¶ 11(iii); *see also Avanti*, 582 B.R. at 618–19 (recognizing a foreign scheme with the same voting requirements). Accordingly, enforcing the Scheme and Sanction Order as appropriate relief or additional assistance under section 1521 or 1507 is an appropriate exercise of comity.

88.     Granting comity to the Scheme and Sanction Order should appropriately extend to third–party releases provided for therein.  Importantly, such third–party releases need not be available to a chapter 11 debtor for granting comity to be appropriate in a chapter 15 proceeding.  "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions [appropriately granted in a foreign proceeding], even if those provisions could not be entered in a plenary chapter 11 case."  *In re Metcalfe & Mansfield*, 421 B.R. at 696.

89.     This Court has not hesitated to enforce third-party releases similar to the Releases in various foreign proceedings.  *See, e.g.*, *Sino-Forest.*, 501 B.R. at 665 (enforcing foreign order containing third–party releases); *see also In re Ocean Rig UDW Inc.*, 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing terms of scheme that released subsidiary guarantees); *In re Towergate Fin. plc*, No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015) (ECF No. 16); *In re New World Res. N.V.*, No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014) (ECF No. 20).

90.     This Court enforced a United Kingdom scheme and sanction order where "failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring."  *Avanti*, 582 B.R. at 606.   The same circumstances are present here.  Failure to enforce the Releases relating to the Released Parties will result in prejudicial treatment of certain creditors and parties in interest to the detriment of the Debtor's reorganization efforts and will prevent the fair and efficient administration of the Restructuring.  *See Avanti*, 582 B.R. at 606 ("Without releasing those guarantees, it would be difficult to restructure the debt because the collective assets and earnings of the group are needed to support the restructured debt without the risk of some creditors that hold the guarantees separately reaching the assets of the affiliates, endangering the group to meet its restructured debt obligations.").  If the Court declines to enforce the Releases of the Released Parties in the Scheme, then certain Scheme Creditors or other entities could seek to obtain judgments in the United States against the Debtor or other Released Parties to obtain greater recoveries than those to which they are entitled under the Scheme.

91.    The Releases are also necessary to facilitate the support of certain parties in interest who may be at risk of litigation without such Releases, or who otherwise view the Releases as a form of consideration for their support of the Restructuring.  Indeed, each of the Trustee, Merced, Voya, Assured Guaranty, Ambac, SLD, and the New Reinsurer indicated in negotiations regarding the Restructuring that approval of the Releases by the Irish Court, and recognition of the same by the Court, were necessary for them to support the terms of the Restructuring.  If the Scheme Creditors can effectively evade the terms of the Scheme and the Restructuring by commencing actions in the United States, the Released Parties involved in the Restructuring would be required to defend any such proceedings and deplete the resources of the restructured business to the detriment of the Restructuring.  Furthermore, the Releases against the Debtor and the Released Parties are provided only by and with the deemed unanimous consent of the Scheme Creditors.  Such consent will not be deemed unless the Scheme is sanctioned by the Irish Court, after receiving the approval of a greater than 50% majority in number and at least 75% in value of the Scheme Creditors voting at the Scheme Meetings.

92.    Thus, principles of comity support enforcement of the Scheme and the Releases of the Released Parties therein, whether or not the same relief could be ordered in a plenary chapter 11 case. *See Avanti*, 582 B.R. at 619 (enforcing a scheme and sanction order including third–party releases); *Sino-Forest*, 501 B.R. at 665 ("[W]here third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy . . . ."); *Metcalfe*, 421 B.R. at 700 ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").

**E.     The Standard for Injunctive Relief Is Satisfied with Respect to Enforcement of the Scheme and Releases**

93.     Pursuant to section 1521(e) of the Bankruptcy Code, the standard for injunctive relief under federal law applies in chapter 15 cases.  11 U.S.C. § 1521(e).  To obtain a permanent injunction, a movant must demonstrate that (i) an injunction is required to avoid irreparable harm and (ii) he succeeds on the merits.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995).

94.     With respect to the second factor, the Foreign Representative seeks injunctive relief enforcing the Scheme and Irish Orders in the United States only upon recognition thereof as part of the Proposed Order.  Therefore, at the time such discretionary relief is granted, the requirement that the movant succeeds on the merits will be satisfied.

95.     With respect to the first factor, irreparable harm exists where the orderly and equitable determination of claims and distribution of a debtor's assets could be disrupted absent injunctive relief.  *See, e.g.*, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("The guiding principle of bankruptcy law is equality of distribution . . . .  As a rule, therefore, irreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of the other creditors."); *In re Rubin*, 160 B.R. 269, 283 (Bankr. S.D.N.Y. 1993) (quoting *In re Lines*, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988) ("[T]he premature piecing out of property involved in a foreign liquidation proceeding constitutes irreparable injury.").

96.     As discussed above in the context of  demonstrating that enforcement of

the Scheme and Releases is appropriate, an injunction enforcing the terms of the Scheme and

Irish Orders in the United States is necessary to prevent Scheme Creditors or other entities from

seeking to obtain judgments in the United States against the Debtor or other Released Parties to

obtain greater recoveries than those to which they are entitled under the Scheme.  If the Scheme

Creditors can effectively evade the terms of the Scheme and the Restructuring by commencing

actions in the United States, parties involved in the Restructuring would be required to defend

any such proceedings and deplete the resources of the restructured business to the detriment of

the Restructuring.  In addition, enforcement of the Scheme and Irish Orders in the United States

is a precondition to the effectiveness of the Restructuring under the Restructuring documents

negotiated by the parties thereto.  For these reasons, allowing creditors to re-litigate issues

determined in the Scheme and Irish Orders in the United States would threaten the success of the

Reorganization and cause "irreparable harm" to the Debtor.  The granting of the requested relief,

conversely, would protect the interests of the Scheme Creditors by maximizing the total value

available for distribution and ensuring that claims are determined and paid on a consistent,

nondiscriminatory basis in accordance with the terms of the Scheme and Irish Orders.

97.     Both prior to and since the enactment of Chapter 15, courts have readily

granted permanent injunctive relief to enforce foreign restructuring plans and discharges.  *In re*

*Bd. of Dirs. of Telecom Arg., S.A.* (2d Cir. 2008) (affirming bankruptcy court decision granting

full force and effect to Argentine plan); *In re Rede Energia S.A.*, 515 B.R. 69, 93 (Bankr.

S.D.N.Y. 2014) ("The request by the Foreign Representative that the Court . . . enjoin acts in the

U.S. in contravention of the [foreign confirmation decision] is relief of a type that courts have

previously granted under section 304 of the Bankruptcy Code and other applicable law.") (citing

*In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 174–76 (2d Cir. 2008)); *In re Sino-Forest Corp.*, 501 B.R. 665 (Bankr. S.D.N.Y. 2013) (granting permanent injunctive relief to enforce Canadian plan, including third–party releases); *In re Metcalfe & Mansfield*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (same).

98.     The injunctive relief sought herein would not cause undue hardship or prejudice to the rights of any creditor based in the United States.  In fact, the procedures for participating in and voting on the Scheme under Irish law are applied uniformly to all of the Debtor's creditors, wherever they reside.  Moreover, the panoply of rights of Scheme Creditors to participate in and object to the Scheme process in regular proceedings before the Irish Court are discussed above with respect to the recognition of the Scheme.  In short, the injunctive relief sought herein seeks only to give effect to the orderly and equitable implementation of the Scheme and Irish Orders in the United States.

**F.     The Relief Requested Is Consistent with United States Public Policy and Policy Behind Bankruptcy Code**

99.     The purpose of chapter 15 is set forth in section 1501 of the Bankruptcy Code and includes:

> (i) cooperation between (a) courts of the United States, the United States Trustee, trustees, examiners, debtors, and debtors in possession; and (b) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases; (ii) greater legal certainty for trade and investment; (iii) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; (iv) protection and maximization of the value of the debtor's assets; and (v) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.  Recognition of the Irish Proceeding as foreign main proceedings comports with all of these objectives.

100.     While section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the Court from refusing to take an action otherwise required therein if such action would be manifestly contrary to the public policy of the United States, the public policy exception is narrowly construed.  *See, e.g.*, *Sino-Forest*, 501 B.R. at 665; *Metcalfe*, 421 B.R. at 697; *In re Vitro S.A.B. de* , 701 F.3d 1036, 1069 (5th Cir. 2012)  Moreover, the public policy exception must be viewed in light of one of the fundamental goals of the Bankruptcy Code—the centralization of disputes involving the debtor.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court . . . .") (internal citations and quotation marks omitted).  Indeed, as some courts have noted:

> American courts have long recognized the need to extend comity to foreign bankruptcy proceedings because the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail.

*Atlas Shipping*, 404 B.R. at 733 (internal quotation marks omitted) (citing *Victrix*, 825 F.2d at 713–14); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005) ("We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.").

101.     Recognition of the Irish Proceeding as a foreign main proceeding will enable the Debtor to fully implement the Restructuring as intended pursuant to the Scheme, facilitate a meaningful distribution for its creditors and ensure that its go-forward obligations under its reinsurance business are novated to the New Reinsurer, who is an able and appropriate third–party reinsurer.  Moreover, recognition of the Irish Proceeding by the Court is a condition to implementing the Scheme under its terms.

102.    Recognition of the Irish Proceeding would also promote the fair and efficient administration of a cross-border reorganization procedure that protects the interests of all stakeholders and interested parties.  By recognizing the Irish Proceeding and granting the relief requested, the process of resolving any residual claims against the Debtor would be centralized in Ireland.  Claims would be treated in accordance with the Scheme that comports with Irish law, which is similar to comparable United States laws, and any disputes would be subject to the uniform jurisdiction of one tribunal—the Irish Court.  Recognition will enable the orderly administration of the Debtor's assets and foster cooperation between courts in Ireland and the United States.  Such orderly administration is demonstrably consistent with the public policy of the United States and the Bankruptcy Code.  *See Sino-Forest*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that, in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy").  If the Scheme sanctioned by the Irish Court is not enforced in the United States, the uniform and orderly administration of the Debtor in the Irish Proceeding would be jeopardized.  *See Avanti*, 582 B.R. at 619 ("The failure of a US bankruptcy court to enforce the Guarantor Releases could result in prejudicial treatment of creditors to the detriment of the Debtor's reorganization efforts and prevent the fair and efficient administration of the Restructuring.").

103.    If the Court does not recognize the Scheme, including the Releases of the Released Parties therein, then the Irish Proceeding faces legal uncertainty and the Scheme, and therefore the Restructuring, may not succeed.  Additionally, failure to enjoin the Scheme Creditors or enforce the Releases in the United States may result in unnecessary enforcement costs or the piecemeal disposition of assets to the detriment of the Debtor and its various

stakeholders.  The purpose of chapter 15 is to prevent such harms.  *See* 11 U.S.C. § 1501(a) (noting that, among other objectives described herein, chapter 15 facilitates "the rescue of financially troubled business" and provides for the "fair and efficient administration of cross-border insolvencies").

104.    Avoiding such potential adverse outcomes through the formal recognition of the Irish Proceeding and enforcement of the Scheme and the Irish Orders in the United States effectuates the principal objectives Congress articulated when it enacted chapter 15 of the Bankruptcy Code and otherwise comports with U.S. public policy.

## NOTICE

105.    In accordance with Rule 2002(q) of the Bankruptcy Rules, the Foreign Representative has provided notice of this Motion to (i) the Debtor; (ii) the Office of the United States Trustee for Region 2; and (iii) the parties entitled to notice set forth in the *Motion Pursuant to Fed. R. Bankr. 2002 and 9007 Requesting Entry of Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* filed contemporaneously herewith.  The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

106.    No previous request for the relief sought herein has been made by the Foreign Representative to this or any other court.

*[Remainder of page intentionally left blank.]*

49

WHEREFORE the Foreign Representative respectfully requests entry of the Proposed

Order granting the relief requested herein and such other and further relief as the Court may

deem just and appropriate.

Dated:      May 7, 2019
            New York, New York

                                    */s/ Timothy Graulich*
                                    DAVIS POLK & WARDWELL LLP
                                    450 Lexington Ave
                                    New York, New York 10017
                                    Telephone: (212) 450-4000
                                    Facsimile: (212) 701-5800
                                    Timothy Graulich, Esq.
                                    Angela M. Libby, Esq.
                                    Dylan A. Consla, Esq.

                                    *Counsel to the Foreign Representative*

**<u>Exhibit A</u>**

**Proposed Order**